PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

v.

ABDURAHMAN M. ALAMOUDI,
　　　　　　*Defendant-Appellant.*

⎫
⎬
⎭

No. 05-4359

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CR-03-513)

Argued: May 24, 2006

Decided: June 26, 2006

Before NIEMEYER and MOTZ, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Niemeyer and Senior Judge Hamilton joined.

---

## COUNSEL

**ARGUED:** Tonya Lynn Mitchell, MOORE & VAN ALLEN, Char-
lotte, North Carolina, for Appellant. Gordon Dean Kromberg, Assis-
tant United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** James
P. McLoughlin, Jr., Alton L. Gwaltney, III, MOORE & VAN
ALLEN, Charlotte, North Carolina; Stanley L. Cohen, New York,

New York, for Appellant. Paul J. McNulty, United States Attorney, Steven P. Ward, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This case concerns the extent of the Government's authority to seek forfeiture of substitute assets following the entry of a plea agreement and a consent order of forfeiture. Abdurahman Muhammed Alamoudi appeals the district court's grant of the Government's motion for forfeiture of substitute assets. For the reasons that follow, we affirm.

I.

On July 30, 2004, Alamoudi entered into a plea agreement with the United States in which he agreed to plead guilty to engaging in prohibited financial transactions with Libya, in violation of 50 U.S.C.A. § 1705 (West 2003); unlawfully obtaining naturalization, in violation of 18 U.S.C.A. § 1425(a) (West 2000); and "corrupt[ly] endeavor[ing] to impede the due administration of the internal revenue laws," in violation of 26 U.S.C.A. § 7212(a) (West 2002).

Alamoudi stipulated that he had participated in a sophisticated criminal scheme involving the attainment and transmission of money from Libya to the United States and abroad. He admitted that his unlawful conduct involved: "[e]ngag[ing] in financial transactions with the Government of Libya, a country designated under Section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism"; traveling to Libya on his United States passport without first obtaining the necessary license to do so as required by federal law; lying to United States officials by falsely denying that he had traveled to Libya when questioned upon return from such visits; concealing his interests and investments in an account in Switzerland by not reporting them on his tax returns; laundering money; and

conspiring with the Libyan government and dissidents of Saudi Arabia to assassinate Saudi Crown Prince Abdullah.

As part of the plea agreement, Alamoudi consented to forfeit a total of $910,000 in property "traceable to, derived from, fungible with, or that constitutes the proceeds of" his criminal activity. He also agreed to "waive all constitutional and statutory challenges in any manner . . . to any forfeiture carried out in accordance with this plea agreement on any grounds."

The district court accepted the plea agreement and sentenced Alamoudi to 23 years imprisonment and three years of supervised release and imposed $20,300 in fines. The court also entered a consent order of forfeiture in which Alamoudi agreed to forfeit the "$340,000 in cash" that had already been confiscated by British authorities "as property derived from, traceable to, or a substitute for proceeds of his offense," and to "further . . . forfeit" an additional "$570,000, representing proceeds of his violations of conviction."

On January 12, 2005, a year and a half after the entry of the consent order of forfeiture, the Government moved for forfeiture of substitute assets, pursuant to Fed. R. Crim. P. 32.2(e) and 21 U.S.C.A. § 853(p) (West Supp. 2006), stating that "the United States is unable to locate the additional $570,000 . . . despite diligent effort." In support of its motion, the Government submitted the affidavit of FBI Special Agent Debra LaPrevotte in which she explained that "such proceeds likely have been transferred or sold to or deposited with a third party, been placed beyond the jurisdiction of the court, or are concealed in some manner unknown to law enforcement personnel." Because the Government could not locate the additional $570,000, it asked the court to substitute "certain properties in which the defendant appears to have a financial interest," including three parcels of real property and an automobile, to provide the Government with the assets to which it was entitled. The district court granted the Government's motion and authorized the forfeiture of these substitute assets. Alamoudi noted a timely appeal, challenging the forfeiture of substitute assets on three grounds.

## II.

Alamoudi first argues that the Government breached both the plea agreement and the accompanying consent order of forfeiture by seeking forfeiture of substitute assets.[1] He relies on the plea agreement's failure to mention forfeiture of substitute assets, and the consent order's reference to "substitute" assets only in connection with the $340,000 already seized in London. He argues that this amounts to a waiver by the Government of its right to seek forfeiture of substitute assets with respect to the remaining $570,000. This argument fails because it creates waiver where none exists, misconstrues the language in the consent order, and ignores the controlling statutory scheme.

The plea agreement provides in pertinent part that Alamoudi will forfeit

> all interests in all assets derived from his transactions with Libya that he owns or over which he exercises control, directly or indirectly, as well as any property that is traceable to, derived from, fungible with, or that constitutes the proceeds of his offense, including but not limited to the $340,000 in cash seized from him in London in August 2003, and all other monies he received or that were transferred on his behalf from the Government of Libya and/or the World Islamic Call Society, in the amount of $910,000.

Pursuant to this agreement, the court entered a consent order of forfeiture in which the parties agreed that "[t]he $340,000 in cash" already seized from Alamoudi "is forfeited to the United States . . . as property derived from, traceable to, or a substitute for the proceeds of his offense." The order further provided that Alamoudi "shall further forfeit $570,000, representing the violations of conviction."

The plea agreement and consent order expressly provide for forfeiture, and further specify the exact amount to be forfeited. Thus, this is not a case in which the Government agreed to limit the forfeiture

---

[1]Alamoudi does not challenge the original order of forfeiture; rather, he only appeals the forfeiture of substitute assets.

amount but then seeks forfeiture of additional property. *Compare In re Arnett*, 804 F.2d 1200, 1202-03 (11th Cir. 1986) (holding that the Government breached plea agreement when it promised it would seek *only* the $3,000 found on the defendant and nothing more, but then sought forfeiture of defendant's farm). Nor is this a case in which the plea agreement provides for dismissal of the forfeiture claim. *Compare United States v. Alexander*, 869 F.2d 91, 95 (2d Cir. 1989) (holding that the Government breached plea agreement by refusing to dismiss the forfeiture claim as promised).

In fact, nothing in this plea agreement or consent order expressly prohibits the Government from seeking forfeiture of substitute assets at all. Nor, notwithstanding Alamoudi's contrary arguments, does the consent order implicitly waive or limit the Government's right to seek forfeiture of substitute assets. The consent order does note in one paragraph that the $340,000 already seized represents property "derived from, traceable to, or a *substitute* for the proceeds of his offense." (Emphasis added). But this language merely characterizes property that Alamoudi *has already forfeited*, as opposed to property (the remaining $570,000) the Government seeks to forfeit. In stating that some of the already seized $340,000 may be a "substitute" for tainted property (so that Alamoudi cannot later claim that the Government mistakenly seized the forfeited money), the Government did not waive its right to later seek forfeiture of substitute assets for the separate and remaining $570,000 discussed in a different paragraph of the consent order.

Because neither the plea agreement nor the consent order waives the Government's right to seek forfeiture of substitute assets for the additional $570,000 to which it is entitled, the statutory scheme controls. Section 981(a)(1)(C) of Title 18 (West Supp. 2006) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" violations of certain laws, including "any offense constituting 'specified unlawful activity,'" as defined by 18 U.S.C.A. § 1956(c)(7) (West Supp. 2006). Section 1956(c)(7) includes as a "specified unlawful activit[y]" any violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.A. § 1705, an offense to which Alamoudi pled guilty. If a defendant is convicted of such an offense, "the court shall order the forfeiture of

the property as part of the sentence." 28 U.S.C.A. § 2461(c) (West Supp. 2006).

To carry out such a forfeiture, § 2461(c) instructs the court to follow the procedures set forth in 21 U.S.C.A. § 853 (West 1999 & Supp. 2006). *See* 28 U.S.C.A. § 2461(c). Pursuant to § 853(p), a court "*shall* order the forfeiture of any *other* property of the defendant" if it finds that, "as a result of any act or omission of the defendant," the property subject to forfeiture under the statute "(A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty." 21 U.S.C.A. § 853(p)(2) (emphasis added).

Section 853(p) is not discretionary; rather, the statute mandates forfeiture of substitute assets "when the tainted property has been placed beyond the reach of a forfeiture." *See United States v. McHan*, 345 F.3d 262, 271 (4th Cir. 2003). Nothing in the statute requires that, as a prerequisite to seeking forfeiture of substitute assets, the Government must first reference substitute assets or § 853(p) in a plea agreement. Rather, barring the Government's waiver of its rights, *see e.g.*, *Arnett*, 804 F.2d at 1201, when the Government cannot reach the property initially subject to forfeiture, federal law requires a court to substitute assets for the unavailable tainted property. Nowhere in the plea agreement has the Government waived its right under § 2461 (and thus under § 853(p)) to seek substitute assets, and therefore, the underlying statutory scheme not only permitted but mandated the district court to order forfeiture of substitute assets if the conditions of § 853(p) were satisfied.

### III.

Alternatively, Alamoudi contends that the district court violated his Sixth Amendment rights by permitting forfeiture of substitute assets based on facts found not by a jury beyond a reasonable doubt, but rather by the judge by a preponderance of the evidence. According to Alamoudi, in granting the Government's order for forfeiture of substitute assets under § 853(p), the district court violated his "right" to

have a jury find facts "essential to his punishment," in direct contravention of *United States v. Booker*, 543 U.S. 220, 232 (2005). Even if Alamoudi did not waive this contention in his plea agreement (and it appears likely that he did), the argument fails.

*Booker* makes clear that the "right" claimed by Alamoudi is only "implicated" when a court imposes a punishment *beyond the maximum* that the court could have imposed based solely on facts admitted by the defendant or determined by the jury. *Id.* Thus, for a *Booker* violation to be possible at all, the law must impose a maximum above which a sentence may not rise.

Although criminal forfeiture undoubtedly constitutes an element of punishment, *see Libretti v. United States*, 516 U.S. 29, 39 (1995), there is no statutory (or guideline) maximum limit on forfeitures. Rather, criminal forfeitures are indeterminate and open-ended, and may include *all* property "constituting, or derived from, any proceeds the person obtained, directly or indirectly," from his unlawful conduct. 21 U.S.C.A. § 853(a). Once a jury determines or a defendant admits the elements of an offense triggering a forfeiture penalty — like 50 U.S.C.A. § 1705 in the case at hand — the subsequent forfeiture of tainted property is necessarily permissible and within the authorized sentence. *See* 21 U.S.C.A. § 853(a). Because no statutory or other maximum limits the amount of forfeiture, a forfeiture order can never violate *Booker*.

We note that in holding that the Sixth Amendment right recognized in *Booker* does not apply to forfeiture orders, we join every circuit to consider the issue.[2] *See United States v. Leahy*, 438 F.3d 328, 332-33 (3d Cir. 2006) (*en banc*); *United States v. Hively*, 437 F.3d 752, 763 (8th Cir. 2006); *United States v. Hall*, 411 F.3d 651, 654 (6th Cir.

---

[2]In fact, in *Booker* itself, the Court explicitly exempted from its holding forfeitures imposed under 18 U.S.C.A. § 3554. *See Booker*, 543 U.S. at 258. That statute provides for forfeiture when a court imposes a sentence for violations of RICO and certain portions of the Comprehensive Drug Abuse Prevention and Control Act of 1970. 18 U.S.C.A. § 3554 (West 2000). Although § 853(b), not § 3554, authorizes the forfeiture at issue here, the rationale for explicitly exempting forfeiture applies equally.

2005); *United States v. Fruchter*, 411 F.3d 377, 382-83 (2d Cir. 2005); *United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005).

Moreover, despite Alamoudi's arguments to the contrary, an order authorizing forfeiture of *substitute* assets pursuant to § 853(p) does not require a jury determination because it does not at all increase the amount of forfeiture. Rather, § 853(p) simply requires the court to allow the Government to seize substitute property when the defendant has placed the assets initially sought — and to which the Government is legally entitled — beyond the court's reach. *See* 21 U.S.C.A. § 853(p). Congress enacted the substitute assets provision "to make the Government's forfeiture efforts more effective." *United States v. Moffitt, Zwerling & Kemler*, 83 F.3d 660, 669 (4th Cir. 1996). *See also McHan*, 345 F.3d at 271-72. Section 853 provides a tool that the court can use to enforce a criminal forfeiture; it neither leads to nor allows for an increase in the dollar amount of the forfeiture, and therefore, does not increase the punishment imposed. A judicial determination that the government has satisfied the requirements of § 853(p) does not involve a judge's finding of facts that increases the penalty at all, let alone beyond the statutory maximum, and therefore cannot constitute a violation of *Booker*.[3]

Therefore, the Sixth Amendment applies neither to criminal forfeitures in general nor to a district court's order permitting the forfeiture of substitute assets in an appropriate case. To hold otherwise would reward those defendants who, in anticipation of conviction, succeed in transferring assets beyond the reach of the court, an outcome wholly inconsistent with the purposes of § 853(p). *See McHan*, 345 F.3d at 272.

---

[3]Alamoudi's argument that the order allowing forfeiture of substitute assets in this case increases his punishment beyond the statutory maximum permitted by the forfeiture statute is meritless. That order expressly limits forfeiture of substitute assets to the same amount to which the original consent order of forfeiture entitled the Government. Indeed, the substitute assets order provides that if the value of the seized substitute assets exceeds this amount, the Government "shall remit such excess to the defendant." Thus, the substitute assets order in no way increases the penalty above that imposed by the consent order of forfeiture; it only substitutes readily attainable assets for assets rendered inaccessible by the defendant. *See* 21 U.S.C.A. § 853(p).

IV.

Finally, Alamoudi maintains that the Government failed to establish the prerequisites necessary to forfeit substitute assets. We disagree.

For a court to order the forfeiture of substitute assets under § 853(p), it must find that "as a result of any act or omission of the defendant," the forfeitable property "(A) cannot be located upon the exercise of due diligence; (B) has been transferred to . . . a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty." 21 U.S.C.A. § 853(p). *See also McHan*, 345 F.3d at 271. Courts interpret this provision liberally so as to "thwart efforts by a defendant to circumvent the economic impact of an anticipated criminal forfeiture sentence." *Id.* at 272. *See also* 21 U.S.C.A. § 853(o).

In this case, the Government submitted a sworn affidavit of FBI Special Agent LaPrevotte in which she declared that, "[s]ince 2003, agents of the Internal Revenue Service and I have conducted an extensive review of bank account[s], tax returns and financial documents associated with Alamoudi," that we "have searched for the $570,000 Alamoudi received from Lybia but have not been able to locate it." Based on her "experience and training," Agent LaPrevotte concluded that, "as a result of acts or omissions of the defendant," the $570,000 had "been transferred to, or deposited with a third party; placed beyond the jurisdiction of the court; substantially diminished in value; or commingled with other property which cannot be divided without difficulty." Thus, "despite the exercise of due diligence," the Government had been unable to locate the property subject to forfeiture.

Alamoudi argues that this affidavit does not satisfy the requirements of § 853(p), but he points to no evidence countering it, and other evidence in the record supports the affidavit's allegations. In the plea agreement, Alamoudi conceded that he received $910,000 from Libyans, that he deposited the money he received in bank accounts maintained abroad, that he did not report these foreign accounts or his transactions in an attempt to evade the tax laws, and that he conducted

his activities so as to avoid "attracting the attention of law enforcement and regulatory authorities"; he therefore admitted to engaging in a sophisticated scheme to conceal the proceeds of his criminal conduct and to keep the tainted property beyond the reach of the court. Agent LaPrevotte's declaration that she could not with due diligence locate the forfeitable property due to Alamoudi's acts or omissions is completely consistent with Alamoudi's admissions in the plea agreement, and Alamoudi presented nothing to dispute the agent's sworn affidavit at the hearing held on the Government's motion for forfeiture of substitute assets. Agent LaPrevotte's affidavit therefore remains uncontested in the record. Given this undisputed evidence establishing the prerequisites to § 853(p), the Government met its burden, and the district court properly granted the forfeiture of substitute assets.

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.